VECTOR INDUSTRIES, INC., John D. Dyer, and Dyer Investments, Inc., Appellants,

v.

Jack DUPRE, Appellee.

No. 05–89–00791–CV.

Court of Appeals of Texas, Dallas.

July 12, 1990.

---

Anne Gardner, Kenneth L. McAlister, and Edward L. Wilkinson, all of Shannon Gracey Ratliff & Miller, Ft. Worth, for appellants.

Emil Lippe, Jr., Lippe & Associates, P.C., Dallas, for appellee.

Before McCLUNG, KINKEADE and OVARD, JJ.

## OPINION

KINKEADE, Justice.

Vector Industries, Inc., John D. Dyer, and Dyer Investments, Inc. (collectively "Vector") appeal a final judgment in favor of Jack Dupre in this suit on an employment contract and breach of an obligation to repurchase stock pursuant to a shareholders' agreement. Vector argues that: (1) Dupre failed to perform a condition precedent required by the shareholder's agreement; (2) Dupre failed to designate a nationally recognized appraisal firm; (3) the trial court erred when it allowed testimony as to market value of the business from persons not nationally recognized as appraisers; (4) the evidence is insufficient to support the jury finding as to value of the corporation and, (5) the evidence is insufficient to support the jury finding that Dupre performed his duties under the employment contract without negligence. Because Dupre (1) met all the requirements under the shareholder's agreement, (2) designated a nationally known appraiser, (3) introduced sufficient evidence as to the value of his stock, and (4) performed his

duties under the employment contract, we affirm the judgment of the trial court.

## FACTS

In May 1978, John Dyer agreed to sell Jack Dupre and two other individuals a fifty percent share of his business, which then became Vector Industries, Inc. During 1978, the new company made a slight profit, but lost money over the next three years, depleting the available capital. In July 1981, Dyer agreed to furnish additional capital if Dupre and the others agreed to merge Vector Industries into Houston Hospital, Inc., another corporation he owned, for a period of two years. The parties agreed to this arrangement and, during that two years, Dupre functioned as president. At the time of the merger, Dyer instructed Dupre to channel all information regarding the business through his accountant, Harold Craig. Dupre operated the business from Dallas, Texas, and Craig came to Dallas on a quarterly basis to audit the books. Craig also sat in on most of the board of directors meetings. During this period sales increased significantly, after the company hired Ray Anthony, a salesman with five years' experience.

In July 1983, the parties re-formed the corporation and entered into a shareholder's agreement by which Dyer, through Dyer Investments, Inc., owned 60% of the stock, Dupre owned 26.67%, and Anthony owned 13.33%. Dupre and Anthony signed promissory notes for the stock, and Craig retained the stock certificates for Dyer as security on the notes. Dupre acted as president and chief executive officer of Vector Industries, Inc. Dyer acted as chairman of the board. Anthony acted as national sales manager.

In November 1983, Dupre, with the full approval of the board of directors, negotiated a lease/purchase agreement for a manufacturing plant in Colorado City, Texas. On Sunday, July 14, 1985, an explosion occurred at the Colorado City plant. As a result of the explosion, the corporation experienced an immediate shortfall in its production capacity to meet its existing sales. The lease agreement for the plant contained a provision that, upon immediate written notice by the tenant, the landlord would, at its sole cost and expense, rebuild and repair any damaged improvements on the property, provided the rebuilding and repairs took ninety days or less to accomplish. Dupre immediately notified the landlord of the damages and worked out an agreement with the landlord that allowed Dupre to make the repairs and to be reimbursed from the insurance companies later. Without directly consulting the board of directors, Dupre borrowed $100,000 to fund the work and rebuild the plant. Dupre completed the rebuilding and repairs in twenty-two days, and the insurance companies later reimbursed Vector for all of its expenses.

Overall sales for the corporation flattened out in 1984 and into 1985. At the August 1985 board of directors meeting, Dupre asked for $300,000 from Dyer to put into the corporation. At the September 1985 meeting, Dupre again requested money to pay bills or, in the alternative, to temporarily close a Colorado City plant. Dyer refused to invest additional funds unless Dupre agreed to co-sign the note, which Dupre refused to do. Less than two weeks prior to this meeting, Dupre had elected to continue the lease on the Colorado City plant and, as a result, incurred $108,000 in rental obligations for the corporation.

After the September meeting, in anticipation of Dupre's termination, Craig came to Dallas to examine the company's books and to determine a buyout price for Dupre's stock. At a special October board meeting Vector terminated Dupre for the stated reason that he had rebuilt the Colorado City plant without board approval. At trial, Dyer testified that Vector also terminated Dupre because he ran the company poorly and continued the lease on the Colorado plant when the corporation no longer needed the plant. At the October board meeting, Dyer also told Dupre that the company planned to repurchase Dupre's stock pursuant to the shareholder's agreement and that, starting in January 1986, Vector would make a $5,000 payment each

month toward Dupre's interest in the company. After Dupre's termination, Vector's financial status continued to deteriorate, and Vector never made any of these promised payments.

## CONDITIONS PRECEDENT

In its first and second points of error, Vector contends that the jury finding that Dupre performed all his obligations under the shareholders' agreement goes against the great weight and preponderance of the evidence. Vector further contends that the trial court erred when it overruled Vector's motion to disregard the jury finding and when it failed to enter judgment for Vector pursuant to the jury finding that Vector had not prevented Dupre from strictly performing his obligations under the shareholders' agreement. Vector argues that no obligations or liability arose on behalf of the other shareholders because when Dupre failed to deposit the share certificates in escrow, he failed to perform a condition precedent required by the shareholders' agreement. Vector further argues that since the jury found that Vector had not prevented Dupre from performing his obligations, the trial court should have rendered judgment in Vector's favor.

 Conditions precedent consist of acts or events which occur subsequent to the making of the contract that must occur before the parties receive a right to immediate performance or before the parties breach a contractual duty. The court, in determining the meaning and intent of a contract, must look at the entire instrument and must construe and consider all of its provisions together. Where a condition imposes an absurd or impossible result, the court should interpret the contract as imposing a covenant rather than a condition. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex.1976); *R.C. Small & Assocs., Inc. v. Southern Mechanical, Inc.*, 730 S.W.2d 100, 104 (Tex. App.—Dallas 1987, no writ).

In the instant case, the shareholder's agreement required Dupre, upon the election to tender the stock for repurchase, to deposit his share certificates in escrow accompanied by his executed stock powers. On October 31, 1985, pursuant to the shareholder's agreement, Dupre gave timely notice of his intent to exercise his option to resell his stock to Vector and the other shareholders. He forwarded a stock power to an escrow agent in Mississippi, authorizing transfer of the certificate of stock and stating that he would satisfy the unpaid balance of any indebtedness owed to Dyer Investments, Inc. at the closing of the sale of his Vector shares. Vector asserts that Dupre failed to comply with all the conditions precedent of the shareholder's agreement when he forwarded his stock powers to an escrow agent without also depositing the actual share certificates with that agent.

 The purpose of requiring a promisor to place a writing, deed, money, stock, or other property in escrow is to protect the promisee by having a neutral third party hold the item until the happening of a contingency or performance of a condition, and then deliver that item to the promisee. *See* BLACK'S LAW DICTIONARY 489 (5th ed. 1979). Vector, the promisee, already held the share certificates which it asserts Dupre failed to provide. Vector retained these certificates when the parties first entered into the shareholders' agreement with the understanding that once Dupre had paid for the stock he would receive the certificates. Now Vector asserts that Dupre must first pay for the stock, obtain the certificates back from Vector, then tender the certificates to an escrow agent, before Vector incurs any obligation to repurchase the stock. To require the deposit of the certificates with an escrow agent, when the promisee already maintains possession of them, imposes an absurd result. Therefore, under the facts in this case, this court interprets the shareholders' agreement as imposing a covenant rather than a condition. Because Vector already possessed the stock certificates, Dupre's forwarding of his stock powers to an escrow agent fulfilled the remaining requirement for stock repurchase under the shareholders' agreement. We overrule Vector's first and second points of error.

## NATIONALLY RECOGNIZED BUSINESS APPRAISAL FIRM

In its third and fourth points of error, Vector contends that there is no evidence to support the jury finding that Lane McDaniel or his company was a nationally recognized business appraisal firm or, alternatively, that this jury finding goes against the great weight and preponderance of the evidence. Vector argues that the shareholders' agreement required the designation of a nationally recognized business appraisal firm and Dupre failed to prove McDaniel or his company met this requirement. In its fifth point of error, Vector contends that the trial court erred in overruling its objection to the admissibility of McDaniel's testimony and his report as to the market value of the corporation. Vector argues that Dupre's failure to prove McDaniel or his company met the nationally recognized appraisal firm requirement made his testimony and report inadmissible.

■ On appeal, when the court reviews a no evidence challenge, it considers only the evidence and reasonable inferences drawn therefrom which, when viewed in their most favorable light, support the jury verdict. The court must disregard all evidence and inferences to the contrary of the fact finding. If more than a scintilla of evidence exists to support the finding, the no evidence challenge fails. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). Although Vector frames his fourth point of error as a great weight and sufficiency point, since Dupre had the burden of proof on this issue, Vector actually seeks to challenge the sufficiency of the evidence. On appeal, when reviewing all factual insufficiency points, the court considers all of the evidence relevant to the challenged fact and may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

■ The shareholders' agreement provided that, in the event the corporation terminated Dupre and he elected to have the corporation repurchase his shares, the greater of the book value of the shares on the last day of the month immediately preceding termination or a value determined by a nationally recognized business appraisal firm would determine the price the corporation would have to pay Dupre for his shares. The agreement further provided that if the parties were unable to agree on an appraiser, then each party would select its own appraiser within thirty days after the date of Dupre's written notice of election to have the corporation repurchase his stock. If either party·failed to designate an appraiser within the prescribed period, he waived his right to an appraisal by a firm of his choice and was bound by the appraisal of the firm chosen by the other party.

On November 27, 1985, pursuant to the shareholders' agreement, Dupre wrote a letter to Dyer and Anthony designating Lane McDaniel as his choice for an appraiser of the value of the corporation. Vector failed to designate an appraiser within the allotted time limit· under the shareholders' agreement. After he examined Vector's books and records, McDaniel prepared an appraisal, which Dupre submitted to all the parties. When Vector failed to designate an appraiser within the prescribed time limit, it became bound by McDaniel's appraisal.

■ In addition to establishing that he had named McDaniel as his appraiser within the time limit, Dupre also had to establish that McDaniel and/or his firm was nationally recognized. Dupre testified that his attorney located McDaniel through a nationally read publication. McDaniel testified as to his educational background, which included: an undergraduate degree in accounting; a certified public accounting certificate; a law degree; and two or three continuing education courses per year for the last ten or twelve years. He also testified as to his employment background, which included: tax compliance work for Price Waterhouse for one-and-a-half years; estate and gift tax appraisal work; and teaching tax and valuation of property courses in the southwest region, which were attended by people from all over the

country, for the Internal Revenue Service for five-and-a-half-years; serving as a Special Master for property valuation for all but one of the domestic relations courts in Dallas County; and valuating closely-held businesses for his firm for the past eighteen years. Additionally, McDaniel wrote, presented, and published papers on the subject of valuation of businesses, to Southern Methodist Law School, the Texas State Society of Certified Public Accountants, the Family Law Section of the Dallas Bar Association, and the Estate Planning Council of the State Bar of Texas. Finally, McDaniel testified that his firm did eight to ten appraisals of businesses a month for clients both inside and outside of Texas. Vector presented evidence that McDaniel did not belong to the American Society of Appraisers, was not listed in the Dallas telephone book as an appraiser in 1985, and was not on a list of nationally recognized appraisers prepared by its own expert. Dupre's testimony that he initially located McDaniel through a nationally read publication coupled with McDaniel's extensive background in business valuations, both within and outside of Texas; his employment by Price Waterhouse and the Internal Revenue Service; his service as Special Master for the family courts; and his lectures on the subject of business valuation attended by persons from all over the country provided ample evidence from which the jury could find that McDaniel and/or his firm were nationally recognized. Because sufficient evidence exists to support the jury finding that McDaniel and/or his firm was nationally recognized and that finding is not clearly wrong or unjust, we overrule Vector's third and fourth points of error. Since Dupre established that McDaniel was a nationally recognized appraiser, the trial court did not err when it allowed in his testimony and his report as to the market value of the corporation. We overrule Vector's fifth point of error.

## VALUE

In its sixth, seventh, and eighth points of error, Vector contends that the trial court erred when it: (1) overruled Vector's objection to Dupre's testimony as to value and as to Craig's opinion as to value, other than book value, of the corporation; (2) overruled Vector's motion to disregard the jury finding that $250,426.98 would fairly compensate Dupre, and (3) failed to render judgment not withstanding the verdict as to the value of Dupre's stock in the amount of the book value, $3,301. Vector argues that both Dupre's testimony and Craig's opinion as to the value of the corporation, other than book value, were irrelevant because neither of them was a nationally recognized appraiser. Vector further argues that Dupre introduced no competent evidence to support the jury finding as to the $250,426.98 value of his stock and that Vector introduced uncontroverted evidence of $3,301 as the book value of the stock.

The issue as to value that the court submitted without objection to the jury provided as follows:

*Question 8*

What amount, if any, do you find would fairly and adequately compensate Jack Dupre for the following:

. . . .

(a) For the value of his stock in Vector Industries:
Answer: $_____

The issue refers to value generally, without specific reference to market value, book value, or some other measure of value. Therefore, all testimony as to value became relevant for the purpose of answering this question. Dupre properly testified as to the market value of his own personal property. *Porras v. Craig*, 675 S.W.2d 503, 504–05 (Tex.1984). Craig's opinion resulted from a valuation done by him at the request of Vector and, therefore, constituted an admission by Vector. *State v. Buckner Constr. Co.*, 704 S.W.2d 837, 846 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.).

The jury heard the following admissible evidence as to the value of Dupre's stock:

| | |
|---|---|
| 1) McDaniel's market valuation, | $455,856.70 |
| 2) Dupre's market valuation, | $333,375.00 |
| 3) Craig's June 1985 book valuation, | $250,426.98 |
| 4) Craig's September 1985 book valuation, | $ 3,301.00 |

The jury found that $250,426.98 would fairly compensate Dupre for his stock in the corporation. This amount exactly matches Craig's June 1985 book valuation of the corporation. Craig's book valuation on behalf of Vector represented competent evidence to support the jury finding. Because all evidence as to the value of Dupre's stock was relevant and Dupre introduced competent evidence to support the jury finding, we overrule Vector's sixth, seventh, and eighth points of error.

## EMPLOYMENT CONTRACT

In its ninth point of error, Vector contends that the jury finding that Dupre performed his duties for Vector without negligence under the employment contract goes against the great weight and preponderance of the evidence. Vector argues that Dupre's unilateral decision, without consulting the board of directors, to rebuild the Colorado City plant demonstrated negligence in the performance of his duties. Vector further argues that Dupre's renewal of the plant's lease, which committed the corporation to another year's rental, demonstrated negligence in the performance of his duties.

Dupre's duties, if they existed, to consult with the board of directors prior to rebuilding the Colorado City plant or to renewing the lease arose, if at all, under the employment contract. Vector's failure to attack the jury finding that Dupre performed his employment contract with Vector makes an attack based on negligence in the performance of his duties under the contract irrelevant. Because Vector failed to challenge the jury finding that Dupre performed his employment contract, we overrule its ninth point of error. We affirm the judgment of the trial court.